OPINION OF THE COURT
Eileen Bransten, J.
In this proceeding, Petitioner Father, Milo Lazarevic (hereinafter Petitioner), seeks to modify custody and enjoin the parties’ 6x/2-year-old child, Adrian Fogelquist Lazarevic (hereinafter Adrian), from relocating with the custodial parent, Respondent Mother, Jan Fogelquist (hereinafter Respondent), to the Aramco compound in Dhahran, Saudi Arabia.[1]
Respondent opposes the petition to modify custody and requests permission to allow Adrian to permanently reside in Saudi Arabia with Respondent, Respondent’s husband, Eleftherios Lefcochilos (hereinafter Stepfather), and Adrian’s two half-siblings, Sabrina, who is four years old, and Max, who is two years old (hereinafter siblings).
The difficult question before the court is whether it is in Adrian’s best interest to award Petitioner custody and compel Adrian to remain in New York with Petitioner or to maintain custody with Respondent and allow Adrian to relocate to the Aramco compound in Dhahran, Saudi Arabia, with Respondent, Stepfather and siblings.
It is axiomatic that disputes over relocation can be most problematic, emotional and difficult for all concerned. A relocation to Saudi Arabia, by its very nature, would mean a dramatic change in Adrian’s life and in his relationship with his Father, the noncustodial parent. Such a distant relocation has the potential, as the Petitioner fears, to interfere with or even defeat future meaningful involvement between Adrian and his Father. The decision is made even more difficult when it was clear from all of the testimony at this trial that both the Petitioner and Respondent are loving, caring and giving parents and that Adrian has a deep loving, committed and caring relationship with both of his parents.
*345 The unrefuted testimony at the hearing is that, regardless of the outcome of this matter, Respondent will be leaving New York City with her two younger children, Adrian’s siblings, to join the Stepfather who has already moved to Dhahran to pursue financially rewarding employment with Arameo. Accordingly, although the court finds that maintaining the status quo would undoubtedly be in Adrian’s best interest and is something that Adrian himself would desire, to compel such an outcome is regrettably outside this court’s power. While the court has the power to enjoin Adrian from relocating to Saudi Arabia upon a finding that custody with Petitioner is in Adrian’s best interest, the court may not enjoin Respondent from relocating without Adrian.
Although relocation to Saudi Arabia will result in a dramatic change in Adrian’s life, to deny relocation would likewise result in a dramatic change in that Adrian’s life-long relationship with his Mother and relationship with his Stepfather and siblings would end. After an exhaustive review of the testimony heard at trial, the court concludes that it is in Adrian’s best interest to be allowed to relocate with Respondent, Stepfather and his two siblings to Saudi Arabia provided that all the conditions set forth below are met in full prior to the relocation.
In accordance with the Court of Appeals decision in Matter of Tropea v Tropea (87 NY2d 727 [1996]), which replaced the previous “exceptional circumstance” test with a full, general and detailed inquiry as to what is in Adrian’s best interest, the court has reviewed all of the evidence presented in the case to determine whether it is in Adrian’s best interest to move to Saudi Arabia or in his best interest to allow Petitioner to become the custodial parent and compel Adrian to live with his Father in New York.
The court in making its decision has considered and balanced all of the many different and relevant factors which are appropriately considered in determining which of these outcomes is in Adrian’s best interest, to wit: (1) the quality of the alternate home environments; (2) a comparison of the parental guidance which would be provided to the child if relocation were granted and if relocation were denied; (3) the financial status and ability of each parent to provide for the child; (4) the ability of each parent to provide for the child’s emotional and intellectual development; (5) the desires of the child with appropriate weight given to the child’s young age and maturity; (6) the quantitative and qualitative impact upon the child of losing existing contacts with the Father and the *346 community or with the Mother, Stepfather and siblings; (7) the quantitative and qualitative impact upon the noncustodial parent of losing existing contacts with the child; (8) the feasibility of devising a visitation schedule or other arrangement that will enable the noncustodial parent to maintain a meaningful parent-child relationship; (9) the difficulty, advantage and disadvantage that the child will experience in residing and adapting to a remarkably new and different place and culture; (10) the economic necessity or lack thereof for wanting to relocate; (11) the existence of good faith in requesting and opposing the relocation and whether Respondent’s reasons for moving are valid and sound; (12) Respondent’s attempts to obtain a “fresh start”, i.e., whether relocation would strengthen and stabilize the new postdivorce family unit; and (13) the continued or exacerbated hostility between Petitioner and Respondent if relocation were permitted and if relocation were denied. (See generally, Eschbach v Eschbach, 56 NY2d 167 [1982]; Matter of Tropea v Tropea, 87 NY2d 727, supra.)
DISCUSSION
Petitioner argues that Respondent’s request to relocate places her own self-interest over and above Adrian’s needs. He states that Respondent is a qualified medical doctor and a Harvard-trained psychiatrist who has the ability to support herself and her family in New York City if she so desired. Petitioner and the Law Guardian both note that with only part-time efforts as a psychiatrist, Respondent earned between $25,000 and $30,000 in 1995. Furthermore, they propose that if Respondent wanted to establish a private practice in her home so that she could be near her younger children, she could do so without disrupting her family and moving to Saudi Arabia.
Petitioner dedicated much of his efforts at trial to establish that “exceptional circumstances” do not exist in Respondent’s desire to relocate Adrian to Saudi Arabia. Indeed, Petitioner successfully demonstrated that with reasonable efforts Stepfather should have been able to obtain employment in New York State or in a location which would not have such a potentially devastating impact upon Petitioner’s continued visitation with Adrian. Alternatively, Petitioner showed that Respondent has the training and education to supplement, even if she chose to work on a limited basis, any reduction in income that Stepfather would have incurred in obtaining alternative employment had Respondent decided to stay in New York.
*347 Accordingly, under the pre-Tropea standard, as previously adopted in cases such as Elkus v Elkus (182 AD2d 45 [1st Dept 1992] ) and Matter of Radford v Propper (190 AD2d 93 [2d Dept 1993] ), Petitioner would have succeeded in blocking this proposed long distant relocation. Respondent’s own testimony indicates that her desire to relocate is entirely voluntary and motivated by her goal (with all the potential benefits it entails as described below) of living in the Aramco compound in Saudi Arabia.
While it is clear that “exceptional circumstances” do not exist, however, it is equally clear that Respondent’s request to relocate to Saudi Arabia is brought in good faith, to promote continued stability for Adrian and his siblings, to maintain or strengthen Respondent’s financial position without sacrificing her legitimate and established desire to care full time for Adrian and his siblings, and to otherwise improve the family’s quality of life. The desire for such pursuits were recognized in Tropea (supra) to be proper factors in considering a request to relocate. (See, Matter of Gillard v Gillard, 241 AD2d 966 [4th Dept 1997].)
An additional indication behind the legitimacy of Respondent’s decision to seek relocation to Saudi Arabia was that she herself was raised in the Aramco compound in Dhahran, Saudi Arabia. Indeed, Respondent testified that her father was employed by Aramco and that she was happy growing up in Dhahran, has fond memories of going to school there, and that she thrived in what she credibly describes as a comfortable, safe, privileged and secure environment. Respondent acknowledges that it was her idea to encourage her husband to seek employment from Aramco in a position as a civil engineer. The court heard that Respondent used some of her contacts from her days in Dhahran to help her husband secure his new employment with Aramco.
When Stepfather testified, he stated that after he lost his New York job as an engineer with Cashin Industries in 1995, he had difficulty in finding comparable employment. Stepfather testified that during the time he was looking for employment, he and his family lived off Respondent’s savings and/or a loan they received from Respondent’s parents to help the family pay off accumulated credit card debt and for Stepfather to relocate to Saudi Arabia. While the court finds that Stepfather, from his own statements, failed to make great efforts to obtain comparable employment in the United States, the opportunity in Saudi Arabia now presents itself as a means for financial inde *348 pendence with many potential additional benefits flowing to Adrian and his family as discussed below.
Moreover, the court finds that to compel Adrian to live here in New York away from his Mother and siblings without the benefits of any extended family support would not be in Adrian’s best interest notwithstanding the fact that Adrian has a good relationship with his Father. Adrian has always known and enjoyed the supportive benefits of his “stay at home” Mother and the company and developing relationship with his younger siblings. In addition, Adrian has developed a healthy and loving relationship with his Stepfather who loves and treats Adrian equally to his own two children.
Respondent states that since the births of her two younger children (and even after Adrian was born), she has wanted to remain at home to raise them. Stepfather stated that he believed it is his duty to be the wage earner in the family while Respondent stayed at home to take care of the children. Petitioner submits, without further support, that this desire to remain at home to raise the children demonstrates Respondent’s subservient relationship to Stepfather.
Petitioner urges the court to conclude from these facts, among others, that Respondent has placed her interest above Adrian’s and that, as a result, it is in Adrian’s best interest for the court to deny Respondent’s request to relocate to Saudi Arabia with Adrian.
The court must note, however, that Petitioner, despite pressing his efforts over a long period of time to obtain custody and enjoin Adrian’s relocation, has not attempted to secure gainful employment sufficient to support Adrian. His income tax returns and net worth statements do not show that he has the necessary income to provide for Adrian’s minimum needs should the court grant his application and award him custody of his son.
In his testimony, Petitioner assures that he would “do anything” to support Adrian although he believes that he could support Adrian on $20,000 a year. Nevertheless, in 1996, Petitioner grossed only $8,500 from the sale of certain art. Petitioner’s July 8, 1997 net worth statement showed a total of $10,000 in assets and over $19,185 in debts. Petitioner, apart from vague promises that he would secure necessary employment (in a foundry located in Coxsackie, New York, for example), has not demonstrated to the court’s satisfaction that he is willing or even capable of earning additional money.
In contrast, the court must note that Respondent and her husband have supported Adrian since his birth. Stepfather is *349 presently earning $102,000 after taxes. Furthermore, Stepfather’s employment at Aramco provides him with the use of a house with utilities included for only $400 a month and medical insurance for only $60 a month.
While economic stability is not the only criteria and should not be given greater weight than the numerous other factors to be considered by the court in weighing Adrian’s best interests, contrary to Petitioner’s urging, it remains a legitimate factor not to be discarded. (See, Matter of Gillard v Gillard, 241 AD2d 966 [4th Dept 1997], supra.)
To be sure, both parents are capable and would provide Adrian with an equal amount of love and emotional support. Respondent, however, has been Adrian’s primary nurturer since his birth. (See, Matter of Schindler v Schindler, 227 AD2d 634 [2d Dept 1996]; see also, Matter of Cate v La Valley, 229 AD2d 945 [4th Dept 1996].) In addition, in Respondent’s continued care and custody, Adrian would also maintain the additional loving and emotional support that his siblings undoubtedly already have given to him and will provide him in the future.
In an attempt to further describe life in the Aramco compound, Respondent called William Walker, who had been an administrator with Aramco until his retirement in 1995. He testified that there are over 1,700 students in the elementary and junior high school programs. The teachers hired by Aramco to teach in the elementary and junior high schools are mostly individuals holding Master’s degrees and other degrees of advanced learning.
Since there is no high school in the Aramco compound in Dhahran, Aramco pays to send their employees’ children to any public or private high school in Europe or the United States. This is considered by Aramco’s employees to be one of the major benefits provided by Aramco. In addition to paying school tuition and room and board, the company will also pay for the high school student’s transportation back and forth a certain number of times a year. Mr. Walker stated that many of the children chose to attend private boarding schools in the United States such as Phillips Exeter, Choate and Mercersberg Academy as well as many other private schools. Respondent testified that she had attended the schools in the compound and later went to a private school in Europe for her high school education.
Petitioner objects to the educational system which Adrian would attend if he is allowed to relocate to Dhahran. The Law Guardian questions the quality of the schools in the compound: *350 “Schools: This is simply one great big unknown. What are the schools in the compound like? There has been no evidence or testimony in admissible form to show what the schools are like. What are the academic statistics, the curriculum, etc.? Does the government imposed censorship extend into the classrooms? Is the curriculum regulated by what the government believes the children should learn? Is particular emphasis on the Muslim culture taught? Do the children learn about topics, places and events which the Saudi Government might feel threatened by such as Judaism, Israel, etc.”
In contrast, Petitioner proposes to enroll Adrian in the local Coxsackie public elementary school which, according to the New York State Report Card on Public Schools, is ranked as one of the best in New York State.[2] Apart from this one comment on the Coxsackie elementary school system, the court did not hear what other educational or cultural programs distinguish the Coxsackie school system or what plans, if any, Petitioner would have concerning higher educational options.
The court can only conclude that the educational system in the Aramco compound as well as the school system in Coxsackie, New York, appear capable of educating its students. Both systems seem to have succeeded to the degree that they have educated individuals in the past and, with the help of parents, appear capable of educating children in the future. The court also must take into account the fact that Adrian, should his Stepfather remain employed by Aramco when he is ready to enter high school, will be able to attend a first-class private school at no cost to his parents. It is likely that Adrian would then be able to attend a good college which eventually would provide him with the tools to compete in the employment market as a well-educated person.
One of the issues raised by both Petitioner and the Law Guardian is the possibility that Adrian might be a victim of terrorism. Mr. Walker stated that he was not aware of *351 enhanced security in the Dhahran compound in recent years before he retired in 1995 but Ms. Kochinski admitted on cross-examination that after the bombing of the Khobar towers in Dhahran, Saudi Arabia, at the nearby American military base, Americans were warned to “keep a low profile” and to refrain from going to public areas outside the compound unless “absolutely necessary”. Ms. Kochinski stated that after that incident concrete barricades were erected around the two schools, but, Ms. Kochinski said, that apart from these barricades, she was not aware of any other special security measures in the compound.
Throughout the 16-day hearing, both sides addressed the fear of physical danger to Adrian as a potential victim or target of anti-American sentiment in Saudi Arabia. Petitioner submitted United States State Department advisories warning United States citizens to avoid certain areas at night, to be watchful and not to be provocative. Mr. Walker and Ms. Kochinski testified that while they are aware of the possibility of danger, they lived without fear in the compound.
The Aramco compound is a large area surrounded by a fence in the middle of a desert in Saudi Arabia. Respondent notes that the size of the compound is comparable to the area of Manhattan. Both Mr. Walker and Ms. Kochinski testified that the children there are extremely active in numerous outdoor sports, including soccer, baseball, football, horseback riding and other different sports and that these activities occur regularly without fear of an attack. Indeed, Ms. Kochinski stated that she does not lock her doors at night and that many of her friends also do not lock their homes.
Even Mr. A1 Khilewi, Petitioner’s witness, who recently defected from Saudi Arabia, stated that while there have been threats against Americans (the Aramco compound, he stated, is the number two target next to the American military base), these threats had been made by Iran and Iraq and not by Saudi Arabia. Mr. A1 Khilewi stated he did not know of one attack on an American citizen by a Saudi since 1985. The Law Guardian, however, in his brief, claims that the compound and people living in it are “sitting ducks in a volatile region already targeted and attacked by terrorists.”
The court is deeply troubled by the prospect of sending Adrian to an area which might be a target for terrorism. Unfortunately, the court is also aware that there is no place in the world where a person is absolutely safe from a terrorist attack or, indeed, where a person is safe from an attack of *352 random violence. After the recent assaults on American institutions, the World Trade Center, the Federal Building in Oklahoma City, and the nightly barrage of reports of children assaulted or killed by parents or by strangers, the court must conclude that it cannot insure Adrian’s absolute safety anywhere in this turbulent world. It may be that Adrian might be as safe or even physically safer in the Aramco compound in Dhahran where Adrian will be in a secured environment protected not only by Aramco’s security force but, if necessary, by the United States military which is stationed in close proximity to Dhahran.
There is no doubt that in exchange for a physically “safe” environment in the Dhahran compound, as Petitioner urges, Adrian may sacrifice the more expansive freedom of speech, freedom of assembly and freedom of dress which would otherwise be afforded to him here in America. Petitioner and the Law Guardian also predict that Adrian will suffer from deprivation of intellectual stimulation. Both the Petitioner and the Law Guardian point to the fact that the compound does not have museums (apart from one museum on oil production), art galleries, theater companies, professional symphonies and other cultural outlets which Adrian presently enjoys as a young person growing up in New York City.
Respondent and her witnesses counter with the fact that, as Mr. Walker stated, when his family went on vacations, they deliberately went to places where they visited museums, went to shows, saw the theater and, in effect, “soaked up” culture. The court is sensitive that individuals living in the Aramco compound in Dhahran will not have the pleasure of participating in the many varied cultural activities available in New York City or other large metropolitan areas. However, the court will note that this fact is true for many Americans not living in or near a large metropolitan area—solely because this kind of culture is not something that interests them or because they do not have the means to travel and participate in these activities.
Finally, as it concerns the lack of cultural outlets in the compound, the court believes that this can be compensated and rectified during the frequent periods when Adrian will be out of school and vacationing with his family or visiting with Petitioner. The court also believes that in this day of “instant communication” through the use of computers, television, videos and other techniques, the issue of cultural deprivation as a result of isolation is not as problematic as it may have *353 been before the tools of modern life: Adrian will be able to share in the arts, theater and music, if not necessarily in person, then through the use of modem communications.
Petitioner fears that his outgoing and loving relationship with his son may be irreparably harmed by the move. Petitioner states that he will be deprived of frequent and routine visitation with Adrian; that the great distance between Saudi Arabia and New York City and the time it takes to travel between the two places will diminish whatever visitation time he may be given in compensation to losing regular and routine visitation he now enjoys. Petitioner also claims that Respondent and Stepfather have always been antagonistic to Petitioner’s relationship with his son and will actively work to sabotage the relationship.
In further support for his concerns that Petitioner’s loving relationship with his son may be irreparably harmed by the relocation, Petitioner and the Law Guardian both rely on a report of a certified social worker, Jayne Roberman (hereinafter Ms. Roberman), which recommends the denial of Respondent’s right to relocate with Adrian to Saudi Arabia. Ms. Roberman states that a child of Adrian’s age needs frequent, regular visitation with the noncustodial parent in order to establish a healthy and lasting relationship with that parent.
Ms. Roberman opines that Adrian will suffer great pain at being separated from Petitioner who Ms. Roberman finds to be a loving, caring father. Ms. Roberman stated that Respondent’s desire to move to Saudi Arabia is as a result of her “blind adherence” to her husband’s desires. Ms. Roberman submits that longer, but not as frequent visitation with the Petitioner (Respondent has proposed and stated that she will pay to have Adrian visit with his Father on two 21-day periods and one 28-day period which corresponds to Adrian’s trimester school schedule) will not substitute for the more regular visitation as is now in place. Ms. Roberman concludes: “Adrian’s best interest would be served by remaining in New York with both of his parents * * * If Dr. Fogelquist insists on joining her husband in Saudi Arabia then Adrian should not be thrust into a new environment without the proximity of his father. He should, therefore, remain in New York with his father and a visitation schedule should be arranged with his mother.”
As noted above, maintaining the status quo is not an available outcome for this court to compel. It appears from Ms. Roberman’s report and from the testimony at trial that Ms. Roberman’s recommendations may have been tainted by a desire to *354 compel this very result. Indeed, Ms. Roberman entirely discounts and largely ignores the effect it would have on Adrian to be separated from his Mother and his two half-siblings and focuses instead upon the conclusion that Adrian “is far more attached to his father than he is to either” of his siblings. Such a conclusion, even if supported by the record (which it is not), entirely ignores the importance of maintaining Adrian’s present relationship with his Mother, Adrian’s primary nurturer since birth.
Indeed, based upon the credible testimony at the hearing, including this court’s in camera interview with Adrian, the court finds insufficient factual support for such a conclusion. The facts indicate that these parties were never married and that Petitioner has only alternate weekend and Monday visitation (to the extent that Adrian’s school schedule allows) with Adrian.
In response to Ms. Roberman’s report, Respondent called Dr. Alex Weintrob, who is a medical doctor and board certified in child psychiatry. Dr. Weintrob has testified in numerous relocation cases. He noted that it was his professional judgment that Ms. Roberman’s report lacked balance and was not based upon an objective inquiry. Dr. Weintrob stated that Ms. Roberman had not interviewed the parties under the same conditions; that her report focused on Adrian’s reaction to the loss of his Father but did not inquire into Adrian’s reaction if he were to lose the existing contact with his Mother and his siblings; that the report was not based upon the reality of the situation; and that it did not inquire into how Adrian would survive with his Father given the fact that Father has not shown income for the past few years.
While Dr. Weintrob made it clear that he was not in a position to effectively agree or disagree with Dr. Roberman’s conclusions (since he had not done his own forensic evaluation and interview of all the parties), he did voice legitimate concerns over the methodology used to reach the conclusions. Additionally, Dr. Weintrob did state, that from his knowledge of the effect of relocation on young persons, that the more the child loses as a result of relocation, the more difficult it is for the child to adjust.
The court viewed home videos showing Adrian with his Mother, Stepfather and his two half-siblings. The first tape, presented by Respondent, was created after the commencement of the trial but the second tape, presented by Petitioner, showed Adrian at home with the family prior to the beginning *355 of the trial. Both videotapes, while painfully repetitious, nevertheless showed Adrian acting as a normal child, playing with his siblings or by himself. Respondent’s tape, while created for purposes of this litigation, did portray a normal and close knit family unit.
Petitioner’s concerns for his right to continued visitation present the most troubling aspect in this matter. While Respondent has assured Petitioner and this court that Adrian shall be allowed the significant time noted above to visit with Petitioner in New York, enforcement for noncompliance of this promise, including a potential change in custody to Petitioner, would not be a practical remedy in that the relocation to Saudi Arabia will place Adrian and Respondent outside the jurisdictional power of this court for purposes of enforcing this court’s directives.
The court, however, finds that the quantitative and qualitative losses that Petitioner may suffer to meaningful access with Adrian which could potentially result from the relocation do not outweigh the benefits of the relocation. In addition, the court finds that if relocation were not permitted, Adrian would be deprived of the existing and meaningful relationship with his mother and siblings which would cause great pain and turmoil and would not be in Adrian’s best interest.
CONCLUSION
As noted in Tropea (supra, 87 NY2d, at 739), “[w]hile the respective rights of the custodial and noncustodial parents are unquestionably significant factors that must be considered * * * it is the rights and needs of the children that must be accorded the greatest weight, since they are innocent victims of their parents’ decision to divorce and are the least equipped to handle the stresses of the changing family situation.”
While the court cannot guarantee Petitioner enforcement of his rights to continued meaningful visitation and contacts with his son and such rights are indeed invaluable and priceless to both Petitioner and Adrian, Respondent’s compliance with the following conditions before relocation is permitted may provide some deterrent against Respondent’s failure to abide by the visitation schedule she herself has promised.
First, Respondent shall settle an order providing for the posting of a bond or other appropriate security which shall be held in escrow with the Law Guardian in the amount of $80,000 to secure compliance with all provisions of the decision and the following provisions in the order to be settled. Upon *356 substantial noncompliance with any of the directives of this court concerning Petitioner’s rights to visitation and access, Petitioner may move to execute against the bond in addition to any other remedy available to him, including a petition to change custody. The posted bond or security shall be maintained until Adrian reaches the age of 16.
Second, absent further court order, Respondent shall submit to the continuing jurisdiction of this court as it concerns future visitation and custody disputes and designate her present attorneys as her agents for purposes of accepting service of process or subsequent motions in this regard.
Third, in the order to be settled and before relocation is permitted, Respondent shall propose a visitation schedule as offered at trial, to wit, Adrian shall be permitted to visit Petitioner at Respondent’s expense for three to four weeks every three months for a total of 10 weeks per year. The court notes that compliance with this provision will provide Petitioner with the same or more visitation than he currently receives. Respondent shall provide proof that reservations were made and round trip airline tickets purchased for Adrian’s first scheduled visit with Petitioner.
Finally, Respondent shall hire, at her expense, a computer consultant in both New York and Dhahran to select, purchase and set up compatible computer systems with laser printers in both Petitioner’s residence in New York and in Adrian’s new residence in Dharhan to enable Petitioner and son to communicate on the Internet and by fax. Adrian’s computer system shall be placed in his bedroom which will be accessed through a dedicated phone line. In addition, Adrian’s room shall have a telephone with answering machine also with a separate dedicated phone line for Petitioner and Adrian to utilize.
In the order to be settled, Respondent shall propose a reasonable schedule of communication by telephone, Internet and fax and shall provide proof that the aforesaid systems and telephone have been installed, are fully operational and that the dedicated phone lines are in place.

. According to testimony adduced at trial and general industry news found in Westlaw’s industry and business database, Aramco is the Saudi state oil group, a massive and long-established company with global interests in oil and related industries. The Aramco compound, near Dhahran, Saudi Arabia, is a community of Aramco employees and their families which is the size of Manhattan. Dhahran is a modern coastal city in Saudi Arabia’s eastern province 200 miles south of the Kuwait border.

. The court heard testimony that Petitioner does not presently have a home for Adrian in Coxsackie but that he is planning and having a home built from the proceeds of insurance money received after the original structure on Petitioner’s land in Coxsackie burned down. While it is not at all clear at what stage of construction this new home is in or whether the insurance proceeds are enough to pay for its entire completion, Petitioner also maintains a rent-stabilized apartment on Riverside Drive in New York City where he presently lives with several roommates who help him defray the cost of rent. For purposes of this decision, the court has given Petitioner the benefit of the doubt and presumed that the proposed home in Coxsackie would be soon ready and an appropriate place for Adrian to live.